# Exhibit 3

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

Outdoor One Communications LLC,
    Case No.

    Plaintiff,
    Hon.

v.
    **COMPLAINT**

Charter Township of Canton,

    Defendant.

---

Donald R. Sheff II (P78262)
OUTDOOR ONE COMMUNICATIONS LLC
Attorney for Plaintiff
220 South Main Street
Royal Oak, Michigan 48067
248-289-5895
dsheff@primesitellc.com

---

## INTRODUCTION

1. The Charter Township of Canton's Sign Ordinance imposes a prior restraint on speech in the form of a variance scheme which vests Township officials with open-ended discretion to modify any of its sign restrictions on a case-by-case basis.

2. Outdoor One Communications LLC sought, and continues to desire, to erect a sign at an industrial-zoned parcel of property in the Township that electronically displays a variety of truthful commercial and noncommercial off-premises content that changes every eight seconds.

3. To lawfully display its proposed sign, Outdoor must obtain a variance from the Sign Ordinance.

4. In its original lawsuit, Outdoor attacked the Sign Ordinance as an unconstitutional prior restraint on speech.

5. In the final opinion of the original lawsuit, the Sixth Circuit ruled that Outdoor lacked standing to challenge the Sign Ordinance's operation as a prior restraint on speech because it did not satisfy the injury-in-fact element of standing.

6. Specifically, the Sixth Circuit stated that Outdoor failed to allege it "self-censor[ed] because of the prospect of the permitting process" and that it "hasn't alleged that its speech was altered or deterred by any prior restraint." *Outdoor One*

*Commc'ns, LLC v. Charter Twp. of Canton*, No. 21-1323, 2021 WL 5974157, at *4 (6th Cir. Dec. 16, 2021).

7. According to the court of appeals, "[i]f Outdoor had alleged any such injury, *it would doubtless have standing* to challenge Canton's ordinance." *Id.* (emphasis added).

8. Because res judicata does not attach to a claim that lacked subject matter jurisdiction to begin with, Outdoor brings the instant action wherein it asserts the necessary allegations that the Sixth Circuit requires in order to have standing to challenge Canton's variance scheme as an unconstitutional prior restraint on speech.

## PARTIES

9. Outdoor is a Michigan limited liability company with its principal place of business located in the City of Royal Oak, County of Oakland, and State of Michigan.

10. Canton is a Michigan municipal corporation organized under the laws of Michigan and located in Wayne County, Michigan.

## JURISDICTION AND VENUE

11. The Court has jurisdiction over this action under 28 U.S.C. § 1331 because Outdoor's claim arises under the United States Constitution and 42 U.S.C. § 1983.

12.    The Court has jurisdiction over this action under 28 U.S.C. § 1343(a)(3) and (4) because Outdoor seeks to redress the deprivation, under color of state law, of rights secured by the United States Constitution.

13.    Venue is proper in the Court under 28 U.S.C. § 1391(b)(1) because the Defendant resides and Outdoor's claims arose in this judicial district.

## PRIOR PROCEEDINGS

### I.  The initial action.

14.    On April 15, 2020, Outdoor filed a lawsuit against Canton identifying violations of the First Amendment arising from the enactment and enforcement of its Sign Ordinance and facially challenging its constitutionality under 42 U.S.C. § 1983. Compl., *Outdoor One Commc'ns LLC v. Charter Twp. of Canton*, No. 20-cv-10934 (E.D. Mich. Apr. 15, 2020), ECF 1.

15.    The initial complaint asserted four causes of action, whereas Outdoor asserts only one cause of action in this complaint.

16.    In the initial action, Outdoor alleged the Sign Ordinance violated the First Amendment in four ways:

> a. It constituted a scheme of speech regulation which distinguished the regulatory treatment of signs depending on their content that lacked a compelling government interest;

4

    b.  The scheme was overinclusive and underinclusive under both strict and intermediate scrutiny;

    c.  It constituted an unlawful prior restraint on speech; and

    d.  The scheme of regulation created a subjective and indefinite enforcement regime that was unconstitutionally vague.

17.    Outdoor's complaint in the prior action sought injunctive and declaratory relief, in addition to an award of damages and attorney fees.

## II.  The District Court's ruling on Outdoor's prior restraint claim.

16.    On March 3, 2021, this Court denied Outdoor's motion for summary judgment, *Canton*, 2021 WL 807872, and on March 15, 2021, entered summary judgment in favor of Canton. *Canton*, No. 20-cv-10934, ECF 28.

17.    The Court agreed that "Canton's Sign Ordinance does function as a prior restraint" and "creates a cognizable injury to [Outdoor]." *Canton*, 2021 WL 807872 at *5-*6.

18.    However, the Court concluded Outdoor lacked standing to assert its prior restraint claim for lack of redress. *Id.* at *6.

19.    The Court labeled the Sign Ordinance "'a paradigmatic example of content-based discrimination.'" *Canton*, 2021 WL 807872, at *5 (quoting *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 156 (2015)).

20.    The Court explained that "Canton must look at the content of the sign to decide if the message falls into one of the permit-exempt categories" and that "Canton's Sign Ordinance thus singles out specific subject matter for differential treatment." *Id.* at *5.

21.    Outdoor's proposed sign does not fall within any of the Sign Ordinance's permit-exempt categories.

### III.  The Sixth Circuit's ruling on Outdoor's prior restraint claim.

22.    On December 16, 2021, the Sixth Circuit issued an unpublished decision affirming the judgment of the District Court, but in doing so it articulated a basis for affirmance that differed from this Court's ruling. *Outdoor One Commc'ns, LLC v. Charter Twp. of Canton*, No. 21-1323, 2021 WL 5974157 (6th Cir. Dec. 16, 2021).

23.    The Sixth Circuit held that Outdoor lacked standing to challenge the constitutionality of the Sign Ordinance's operation as a prior restraint on speech *not* because Outdoor lacked redress, but because it did not satisfy the injury-in-fact element of standing. *Id.* at *4.

24.    Specifically, the Sixth Circuit stated that Outdoor failed to allege that it "self-censor[ed] because of the prospect of the permitting process" and that it "hasn't alleged that its speech was altered or deterred by any prior restraint." *Id.*

6

25.     The Sixth Circuit explained that "[i]f Outdoor had alleged any such injury, it would doubtless have standing to challenge Canton's ordinance." *Id.*

**IV.  Outdoor's petitions for en banc rehearing and writ of certiorari.**

26.     On December 30, 2021, Outdoor filed its petition for en banc rehearing. Pet. En Banc Reh'g, *Canton*, No. 21-1323, Doc. 33.

27.     En banc rehearing is rare in the Sixth Circuit, having only been granted for two cases per year in 2018, 2019, and 2020. Bailey Wharton, *En Banc in the Sixth Circuit: A Rarely Used, but Important Procedure*, U. CIN. L. REV. BLOG (Oct. 15, 2021), https://uclawreview.org/2021/10/15/en-banc-in-the-sixth-circuit-a-rarely-used-but-important-procedure.

28.     The court of appeals denied Outdoor's petition for en banc rehearing on January 28, 2022. Order, *Canton*, No. 21-1323, Doc. 34-1.

29.     On April 28, 2022, Outdoor filed its petition for writ of certiorari with the Supreme Court of the United States. Pet. For Writ. Of Cert., *Outdoor One Communications LLC v. Charter Township of Canton, MI*, No. 21-1402.

30.     On May 20, 2022, a group of expert legal scholars and Supreme Court practitioners at SCOTUSblog.com named Outdoor's petition for writ of certiorari as one of its "Petitions of the Week."[1] Though the Supreme Court observers identified

---

[1] Andrew Hamm, *Non-unanimous acquittals and attorney-client privilege*, SCOTUSblog (May. 20, 2022, 11:52 PM),

Outdoor's petition as "raising one or more questions that have a reasonable chance of [certiorari] being granted,"[2] the Supreme Court ultimately decided to deny certiorari on June 27, 2022. *Outdoor One Communications LLC v. Charter Township of Canton, MI*, 142 S. Ct. 2874 (2022).

## FACTUAL BACKGROUND

### I. Canton's Sign Ordinance.

31. Canton regulates the display of signs through the Canton Charter Township Code, Appendix A, Article 6A.00 – Signs (the "Sign Ordinance"). The Sign Ordinance, in its entirety, is attached to this Complaint as **Exhibit 1** and is incorporated herein.

32. Under threat of criminal penalty, the Sign Ordinance makes it "unlawful to construct, display, install, [or] change . . . any sign upon any property within the township in violation of the requirements of [the Ordinance]." *Id.* at § 6A.03.

33. Violators of the Sign Ordinance are subject to penalties including fines and imprisonment. **Exhibit 2** at § 27.09.3.

---

https://www.scotusblog.com/2022/05/non-unanimous-acquittals-and-attorney-client-privilege/.

[2] *Petitions of the Week, Explained*, SCOTUSblog, https://www.scotusblog.com/about/petition-of-the-week-explained/.

34.    The Sign Ordinance states that its "purpose . . . is to promote the general safety and welfare of the public by regulating and controlling all public and private graphics communications and displays." **Exhibit 1** at § 6A.02.

35.    As this Court has already acknowledged, Canton's Sign Ordinance is permeated with content-based distinctions and incorporates multiple speech licensing provisions that function as prior restraints on speech.

36.    For instance, some of the content categories regulated by the Ordinance include "political signs," § 6A.09.11, signs "for use by educational nonprofit institutions licensed by the state, houses of worship or other public entities," § 6A.09.8, "[s]igns of a primarily decorative nature, not used for any commercial purpose and commonly associated with any national, local or religious holiday," § 6A.09.10, real estate signs, § 6A.09.7, and "directional signs," § 6A.21, among others.

37.    Strikingly, even the Sign Ordinance's regulations applicable to "billboard" speech are content-based on their face because they are subject to the caveat that "[o]ff-premises *directional* signs . . . *shall not* be considered billboards for the purpose of this chapter," § 6A.01.7 (emphasis added).

38.    In that way, the Sign Ordinance's definition of "billboard," even when read in isolation from the rest of the content-based scheme, "singles out specific subject matter [i.e., directional content] for differential treatment." *Reed*, 576 U.S.

at 156; *accord City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1472 (2022) ("Unlike the sign code at issue in *Reed*, however, the City's provisions at issue here do not single out any topic or subject matter for differential treatment.").

39. For example, under the Sign Ordinance, a sign that displayed a message stating "God is Listening!" would fall within the definition of a "billboard," while a sign that states "God is Listening . . . at St. Paul's Parish, Next Exit!" would fall within the definition of a "directional sign."

40. "Billboard" signs and "directional" signs are regulated differently under the Sign Ordinance.

41. As the District Court previously recognized, these and the other content-based regulatory distinctions found throughout the Sign Ordinance require the Township's "enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (cleaned up).

42. A "billboard" sign is defined as a sign that is "erected for the purpose of advertising a product, event, person, or subject not related to the premises on which the sign is located." *See* § 6A.01.7; § 6A.24.

43. As a result of its broad definition of a "billboard" sign which includes the display of abstract "subject" matter, the Sign Ordinance, on its face, *prohibits*

signs that display certain categories of core protected speech that invariably fall within its definition of "billboard" speech.

44. The Township surreptitiously effects this *prohibition* by imposing a requirement that all "billboard" signs shall be located in a "GI" zoning district and situated "adjacent to limited access interstate freeways." § 6A.24.

45. However, there are no "GI" zoning districts adjacent to the only limited access interstate freeway in the Township.

46. Consequently, there are no locations where a "billboard" sign may be lawfully erected in the Township – *unless the speaker obtains a variance*.

47. The significance of this oppressive regulatory feature is that signs containing speech that happen to fall within the broad definition of a "billboard" sign, such as many forms of ideological, patriotic, social, and religious speech, can *never* lawfully be displayed in the Township – *unless the speaker obtains a variance.*

48. The Sign Ordinance operates as a prior restraint on speech by incorporating a variance process by which a speaker must first seek approval from the Township to display a sign that would otherwise violate the underlying restrictions in Ordinance.

49. The Sign Ordinance states that "[i]f there is believed to be a conflict between the stated intent and any specific provisions of [the Sign Ordinance], the zoning board of appeals may, in accordance with established procedures, permit

11

modification of such specific provisions while retaining the intent in such appealed instance." § 6A.04.

50. The criteria by which the Township grants variances are subjective and arbitrary.

51. These criteria include whether the "variance . . . will not be *materially* detrimental to the *public welfare* or *materially* injurious to other nearby properties or improvements," §27.05.D.1 (emphasis added), whether the variance "can be granted *in such fashion* that *the spirit of the ordinance* will be observed and public safety and *welfare secured*," § 27.05.D.1 (emphasis added), and whether "[g]ranting of a requested variance . . . would do *substantial justice* to the applicant." § 27.05.D.1 (emphasis added). **Exhibit 3**.

## II. Outdoor's proposed speech.

52. Outdoor sought and was refused a sign permit to display a digital sign at an industrial-zoned parcel of real property adjacent to an interstate freeway in the Township identified by parcel/tax identification number 71-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-002.

53. Canton stated that the proposed sign violated the Sign Ordinance's size and height regulations for "billboards." **Exhibit 4**.

54. Outdoor has not applied for a variance from Canton's Sign Ordinance and refuses to submit itself to Canton's subjective and arbitrary variance scheme.

**III.** **Canton allows favored speakers to sidestep the restrictions imposed by the Sign Ordinance.**

55.     Canton has a controversial history of approving signs to be displayed in the Township that are too big under its Sign Ordinance.

56.     Below, Sections III.A through III.D provide egregious examples of Canton granting such approvals for favored speakers to display signs that are illegal under its Sign Ordinance.

57.     Perhaps the most concerning is the example detailed in Section III.B where Canton demanded, and received, a cash payoff in exchange for, among other things, granting sign variances to a large corporation.

### A. Canton has granted exemptions from the Sign Ordinance when the speaker promises to provide economic benefits to the Township.

58.     On October 25, 2004, IKEA North America Services, LLC, through its agent, filed an application for Planned Development District Review, wherein it sought to erect an IKEA retail center in Canton. **Exhibit 5**.

59.     IKEA's proposed development included dozens of signs – almost none of which complied with the Sign Ordinance (the "Noncompliant Signs"). **Exhibit 6**.

60.     Among the Noncompliant Signs, IKEA sought to erect a *900 square foot three-sided billboard* (the "IKEA Billboard") adjacent to Interstate I-275 on a vacant parcel of property that IKEA labeled as a "widow parcel." **Exhibit 6** at p.2; **Exhibit 7** at p.6.

13

61. The proposed IKEA Billboard indicated an overall height of 75 feet. **Exhibit 6** at p.2; **Exhibit 7** at p.6.

62. The proposed IKEA Billboard did not come close to complying with the Sign Ordinance. **Exhibit 7** at p.6.

63. The proposed IKEA Billboard structure also included *an additional 375 square foot three-side billboard* mounted on the sign structure beneath the IKEA Billboard "to help Canton in its own branding efforts." (the "Canton Branding Billboard"). **Exhibit 7** at p.7; **Exhibit 6** at p.2.

64. The Canton Branding Billboard did not comply with the Sign Ordinance. **Exhibit 7** at p.7.

65. For IKEA to erect its proposed assortment of (otherwise) unlawful signs it needed to obtain approval from Canton to do so. **Exhibit 8**.

66. During this process of approval, Canton acknowledged that "[t]he provisions of the Sign Ordinance cannot be varied by [an agreement known as a] PDD agreement" and that "[t]he Zoning Board of Appeals must grant any such variances." **Exhibit 8**.

67. IKEA applied to Canton's ZBA for permission to erect the Noncompliant Signs. **Exhibit 7**.

14

68. In its application, IKEA conceded the obvious – that its proposed three-sided billboard "could be considered a 'billboard sign'" under the Sign Ordinance. **Exhibit 7** at p.6.

69. Canton evaluated IKEA's ZBA application under the following standard: whether the proposed signs conformed with "the spirit and intent" of the Sign Ordinance. **Exhibit 9** at p.13.

70. On April 6, 2005, Canton considered IKEA's request to erect the Noncompliant Signs at a special meeting of its ZBA. **Exhibit 9**.

71. At the meeting, members of the public complained that IKEA was receiving special treatment from the Township regarding its signage requests.

72. One member of the public stated that "[h]e ha[d] no objection to IKEA," but "hope[d] that the rest of the community will be given the same considerations as IKEA has been given." **Exhibit 9** at p.4.

73. In response, Mr. Baylock, a member of the ZBA, stated he did not see "IKEA getting special treatment, *but the appropriate treatment for a business of this size*." *Id.* at p.5 (emphasis added).

74. In reply, a member of the public stated that "what Mr. Baylock said [in the above paragraph] was discriminatory." *Id.*

75. Similarly, a member of the public lamented the fact that, in Canton, "[a] big business will get a pass on the ordinance where a small business will not." *Id.*

15

76. And another member of public stated that "[h]e hopes the concessions [that] are provided to IKEA will also be provided to other businesses in the area who are being forced to lower, change, or shrink their signs." *Id.* at p.6.

77. Notwithstanding the complaints by the public of discriminatory enforcement of the Sign Ordinance and speaker favoritism, on April 6, 2005, the ZBA voted to allow IKEA to erect a broad array of signs that did not conform with the requirements of the Sign Ordinance. *Id.* at p.11-12.

78. Months later, the ZBA amended its April 6, 2005, meeting minutes to include a document entitled "Resolution" which stated "findings of fact" to retroactively support its earlier decision to approve IKEA's signage requests. *Id.* at p.12.

79. The Resolution stated that Canton's decision to approve IKEA's signage requests constituted "*the subjective application* of the remedial powers vested in the ZBA." *Id.* at p.14-15 (emphasis added).

80. The Resolution approving the signs stated that "the official public record…clearly demonstrates a factual record consisting of facts presented by [IKEA] and others…upon which *reasonable minds could not differ* in finding that the proposed IKEA CANTON Store presents such a *unique and rare opportunity* for the Canton community that would not be easily matched or duplicated by other Appellants, whether *in terms of economic development*, *increased property values*,

16

*increased opportunities for existing Canton businesses*, *international recognition and stature*, and *elevation of Canton's identity in the commercial real estate markets facilitating and attracting various retail operators which have otherwise not chosen to locate in Canton*." *Id.* at p.15 (emphasis added).

81.     In the Resolution, Canton stated that its decision was "consistent with the spirit, intent and objectives of the Sign Ordinance." *Id.*

82.     In total, Canton approved 2,277.63 square feet of wall signage (where the Sign Ordinance only allowed 200 square feet), 1,225 square feet of total signage to be displayed on the IKEA Billboard structure, and numerous other signs that otherwise patently violated the Township's Sign Ordinance. *Id.* at p.16-20.

**B. Canton grants a sign variance in exchange for a large cash payment demanded by Township officials.**

83.     In 2014, IKEA communicated to Canton its intention to expand its Canton retail location.

84.     As a part of that expansion plan, IKEA sought to erect signage that was not previously approved by the ZBA.

85.     On January 24, 2014, Canton stated that it would require IKEA to either make a $650,000 cash "donation" to Canton or to transfer other IKEA assets to Canton in order for IKEA to move forward with its expansion plans. **Exhibit 10**.

86. IEKA eventually agreed to pay off Canton to obtain the approvals it needed to proceed with its expansion plans, including variances from the Sign Ordinance to erect large-scale signs.

87. For its part, Canton guaranteed that "certain variances from the requirements of the Canton Township Zoning Ordinance" including "[v]ariances to the sign ordinance requirements" would be granted to IKEA. **Exhibit 11** at p.2.

88. And for IKEA's part, it agreed to make "a one-time payment" in the amount of $242,000 to Canton, a separate "contribution" of "in-kind activity," and agreeing to convey certain real estate rights to a private third-party business operating in the Township. *Id.*

89. Both IKEA and Canton conceded that IKEA's payment to Canton represented "an enticement for the Township to *exercise its discretion*" in providing the sign variances. *Id.* (emphasis added).

### C. Canton has a history of unlawfully issuing sign permits for large signs up to 1,000 square feet in size.

90. Often Canton simply decides to unlawfully approve sign permits for signs that do not comply with the Sign Ordinance, nor receive a variance.

91. On July 28, 2009, Canton approved a sign permit to allow IKEA to display a 1000 square foot sign, even though the sign did not comply with the Sign Ordinance and IKEA did not receive a variance to display the sign. **Exhibit 12** at p.17-20.

18

92.     On September 14, 2009, Canton approved a sign permit to allow IKEA to display a 1000 square foot sign, even though the sign did not comply with the Sign Ordinance and IKEA did not receive a variance to display the sign. *Id.* at p.21-25.

93.     On March 10, 2010, Canton approved a sign permit to allow IKEA to display a 1000 square foot sign, even though the sign did not comply with the Sign Ordinance and IKEA did not receive a variance to display the sign. *Id.* at p.30-33.

94.     On July 27, 2010, Canton approved a sign permit to allow IKEA to display a 1000 square foot sign, even though the sign did not comply with the Sign Ordinance and IKEA did not receive a variance to display the sign. *Id.* at p.42-45.

95.     On October 1, 2010, Canton approved a sign permit to allow IKEA to display a 1000 square foot sign, even though the sign did not comply with the Sign Ordinance and IKEA did not receive a variance to display the sign. *Id.* at p.46-49.

96.     On November 4, 2010, Canton approved a sign permit to allow IKEA to display a 1000 square foot sign, even though the sign did not comply with the Sign Ordinance and IKEA did not receive a variance to display the sign. *Id.* at p.50-53.

97.     On June 28, 2011, Canton approved a sign permit to allow IKEA to display a 1000 square foot sign, even though the sign did not comply with the Sign Ordinance and IKEA did not receive a variance to display the sign. *Id.* at p.66-69.

19

98.     On August 1, 2011, Canton approved a sign permit to allow IKEA to display a 1000 square foot sign, even though the sign did not comply with the Sign Ordinance and IKEA did not receive a variance to display the sign. *Id.* at p.70-73.

99.     On October 27, 2011, Canton approved a sign permit to allow IKEA to display a 1000 square foot sign, even though the sign did not comply with the Sign Ordinance and IKEA did not receive a variance to display the sign. *Id.* at p.74-77.

100.    On December 28, 2011, Canton approved a sign permit to allow IKEA to display a 1000 square foot sign, even though the sign did not comply with the Sign Ordinance and IKEA did not receive a variance to display the sign. *Id.* at p.78-81.

101.    On March 5, 2012, Canton approved a sign permit to allow IKEA to display a 1000 square foot sign, even though the sign did not comply with the Sign Ordinance and IKEA did not receive a variance to display the sign. *Id.* at p.82-85.

102.    On June 18, 2012, Canton approved a sign permit to allow IKEA to display a 1000 square foot sign, even though the sign did not comply with the Sign Ordinance and IKEA did not receive a variance to display the sign. *Id.* at p.86-89.

103.    On January 9, 2013, Canton approved a sign permit to allow IKEA to display a 1000 square foot sign, even though the sign did not comply with the Sign Ordinance and IKEA did not receive a variance to display the sign. *Id.* at p.90-93.

104. On February 21, 2013, Canton approved a sign permit to allow IKEA to display a 1000 square foot sign, even though the sign did not comply with the Sign Ordinance and IKEA did not receive a variance to display the sign. *Id.* at p.94-97.

105. On June 24, 2013, Canton approved a sign permit to allow IKEA to display a 1000 square foot sign, even though the sign did not comply with the Sign Ordinance and IKEA did not receive a variance to display the sign. *Id.* at p.98-101.

106. On September 27, 2013, Canton approved a sign permit to allow IKEA to display a 1000 square foot sign, even though the sign did not comply with the Sign Ordinance and IKEA did not receive a variance to display the sign. *Id.* at p.102-105.

107. On March 10, 2014, Canton approved a sign permit to allow IKEA to display a 1000 square foot sign, even though the sign did not comply with the Sign Ordinance and IKEA did not receive a variance to display the sign. *Id.* at p.106-109.

108. On or about April 14, 2015, Canton approved a sign permit to allow IKEA to display a 675 square foot sign, even though the sign did not comply with the Sign Ordinance and IKEA did not receive a variance to display the sign. *Id.* at p.110-114.

109. On July 22, 2015, Canton approved a sign permit to allow IKEA to display a 675 square foot sign, even though the sign did not comply with the Sign Ordinance and IKEA did not receive a variance to display the sign. *Id.* at p.120-123.

**D. Canton granted a large sign variance to a local retailer when the retailer argued it suffered "hardship as a competitor" in the commercial marketplace.**

110. On October 13, 2016, Canton granted Art Van Furniture a sign variance. **Exhibit 13**.

111. At the October 13, 2016, ZBA meeting, Art Van requested a variance "from [the] 150 sq. feet [size] limitation for 595 sq. feet of signage." *Id.* at p.3.

112. Art Van complained that "IKEA sells furniture; we sell furniture. We have multiple signs but one [IKEA] sign alone is over 850 sq. feet. Just 70' X 12' and that is just the IKEA part. That is the context we are up against." *Id.*

113. At the meeting, Canton's planning staff recommended the ZBA approved the additional Art Van signage, reasoning that "[w]ith IKEA directly across the street, I can see where [Art Van] feel[s] this is a hardship as a competitor." *Id.*

114. Upon approving the Art Van variance request, a ZBA official stated that "I don't think anybody is going to miss the Art Van store. . . . It's on Ford Road but if [Art Van] feel[s] people will miss it, I am ok with [the variance]." *Id.* at p.4.

22

## LEGAL BACKGROUND

### I. The prior restraint doctrine.

#### A. The substantive constitutional doctrine.

115.    The requirement of government approval, by way of a license, permit, or otherwise, before engaging in expression is a prior restraint that is presumed to be unconstitutional unless certain safeguards are met, including, but not limited to, definite and objective standards to guide the decision to issue a permit.

#### B. Standing to challenge a prior restraint.

116.    The Supreme Court states that "it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license." *Freedman v. State of Md.*, 380 U.S. 51, 56 (1965)

117.    "Standing is recognized in such cases because of the danger of tolerating, in the area of First Amendment freedoms, the existence of a penal statute susceptible of sweeping and improper application." *Id.* (cleaned up).

118.    The Supreme Court also emphasizes that a challenge to a prior restraint on speech does not mean the speaker "has restricted himself to an attack on that section alone, and lacks standing to challenge any of the other provisions (or alleged shortcomings) of the statute," but may challenge the licensing scheme in its

23

"concrete statutory context" where it "effects an invalid prior restraint because the structure of the other provisions of the statute contributes to the infirmity." *Id.* (cleaned up).

119. Recently, the Sixth Circuit specifically addressed standing to attack a sign ordinance based on a constitutionally repugnant variance scheme embedded therein, explaining that "[i]t would amount to circular logic to say that [a speaker] lacks standing to challenge [a sign] ordinance because it challenges the very provision that gives it standing to challenge the ordinance. Such an approach would render the constitutionality of most variance provisions unreviewable." *Int'l Outdoor, Inc. v. City of Troy, Michigan*, 974 F.3d 690, 702 (6th Cir. 2020).

120. For this case, in order to satisfy the injury-in-fact element of standing, Outdoor must additionally allege "that its speech was altered or deterred by . . . [the] prior restraint" causing it to "self-censor because of [its] prospect." The Sixth Circuit stated that "[i]f Outdoor had alleged any such injury, it would doubtless have standing to challenge Canton's ordinance." *Canton*, 2021 WL 5974157 at *4.

## C. A constitutional challenge to a prior restraint on speech is necessarily a facial challenge.

121. "A facial challenge is an attack on a statute itself as opposed to a particular application." *City of Los Angeles, Calif. v. Patel*, 576 U.S. 409, 415 (2015).

24

122. "[T]he [Supreme] Court has allowed such challenges to proceed under a diverse array of constitutional provisions." *Id.* (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) for the proposition that "such challenges" may proceed under the First Amendment.).

123. Specifically, when it comes to constitutional challenges to prior restraints on speech, the Supreme Court holds that "when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law *may challenge it facially* without the necessity of first applying for, and being denied, a license." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755–56 (1988) (emphasis added).

124. This is because unlawful prior restraints on speech necessarily "engender identifiable risks to free expression that can be effectively alleviated *only through a facial challenge*" and that it is "*the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion*." *Id.* at 757 (first emphasis added).

125. When a speaker files suit alleging a "statute[ ] threaten[s] these risks to a significant degree" the Supreme Court's instructions could not be more clear: "courts must entertain an immediate facial attack on the law." *Id.* at 759 (emphasis added).

25

**D. Prior restraints are inseverable from the speech restrictions to which they pertain.**

126. The Supreme Court has often repeated that "[g]enerally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem, *severing any problematic portions* while leaving the remainder intact." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2209 (2020) (emphasis added) (cleaned up).

127. To that end, the Supreme Court is "mindful that [its] constitutional mandate and institutional competence are limited" and that it must "restrain [itself] from rewriting state law to conform it to constitutional requirements even as [it] strive[s] to salvage it." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (cleaned up).

128. The Supreme Court's "ability to devise a judicial remedy that does not entail quintessentially legislative work often depends on how clearly [it] ha[s] already articulated the background constitutional rules at issue and how easily [it] can articulate the remedy." *Id.*

129. The "background constitutional rules" that govern the prior restraint doctrine are clear.

130. "Prior restraints are not unconstitutional per se." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975) (citations omitted).

26

131. Rather, an unlawful prior restraint's constitutional defect inheres in its "*absence* of expressed standards" which "effectively gives the [government] unbridled discretion to deny applications" to speak. *Lakewood*, 486 U.S. at 755-58 (emphasis added).

132. When it comes to unconstitutional prior restraints on speech, the Supreme Court has clearly "articulate[d] the remedy": the government must "*incorporate* the required procedural safeguards in the statutory scheme." *Freedman*, 380 U.S. at 60 (emphasis added).

133. The doctrine of severance does not operate to "incorporate" anything into a constitutionally defective law.

134. Moreover, under Michigan law, "[t]o be capable of separate enforcement, the valid portion of the statute must be independent of the invalid sections forming a complete act within itself." *Pletz v. Sec'y of State*, 336 N.W.2d 789, 809 (1983).

135. However, the Sixth Circuit holds that a "variance provision of [a] . . . Sign Ordinance . . . is not independent from other provisions of the ordinance, but rather inextricably linked to them by providing a way of relaxing the very restrictions imposed by the Sign Ordinance." *Troy*, 974 F.3d at 702.

136. Because the Sign Ordinance contains a variance provision that "provid[es] a way of relaxing the very restrictions imposed by the Sign Ordinance,"

27

it "is not independent from other provisions of the ordinance," and, therefore, is inseverable under Michigan law. *Compare id.*, *with Pletz*, 336 N.W.2d at 809.

## COUNT I
### 42 U.S.C. § 1983 DEPRIVATION OF
### CIVIL RIGHTS UNDER COLOR OF STATE LAW —
### UNCONSTITUTIONAL PRIOR RESTRAINT

137.  Outdoor incorporates by reference paragraphs 1-136 above.

138.  Billboard advertising is a form of speech protected under the First and Fourteenth Amendments to the U.S. Constitution.

139.  In *Metromedia, Inc. v. City of San Diego*, the Supreme Court explained that "[t]he outdoor sign or symbol is a venerable medium for expressing political, social and commercial ideas. From the poster or 'broadside' to the billboard, outdoor signs have placed a prominent role throughout American history, rallying support for political and social causes." 453 U.S. 490, 501 (1981) (cleaned up).

140.  Outdoor is engaged in the business of erecting and maintaining outdoor advertising displays, commonly known as billboards, on property it leases for that purpose. Outdoor earns revenue by charging advertisers to display their messages on the billboards.

141.  Outdoor's billboards display noncommercial and truthful commercial messages that digitally change every eight seconds. For example, Outdoor's billboards display political content, ideological content, patriotic content, paid and unpaid religious content and unpaid memorial tributes.

28

142. Digital billboards, like the one Outdoor proposes to erect in Canton Township, incorporates unique technology that allow Amber Alerts, real-time weather warnings, and other time-sensitive emergency messages to be communicated to the public instantly.

143. Outdoor and third parties enjoy the right under the First Amendment to the U.S. Constitution to convey messages to others through the use of billboards, including, but not limited to ideological speech, religious speech, political speech, other forms of noncommercial speech, and truthful commercial messages.

144. Outdoor satisfies all requirements for approval from the Michigan Department of Transportation under Michigan's Highway Advertising Act, M.C.L. § 252.301, et seq., for the erection of a billboard at its proposed location in Canton.

145. Canton has acted under color of state law in its attempts to regulate Outdoor's ability to erect a sign in the Township.

146. Outdoor may only display its proposed sign at its proposed location if it receives a variance from the Township to do so.

147. "[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 150-151 (1969).

29

148. The Sign Ordinance is facially unconstitutional under the First and Fourteenth Amendments to the U.S. Constitution.

149. Canton's Sign Ordinance functions as an unconstitutional prior restraint on speech.

150. Canton possesses unfettered discretion in the decision to grant variances to the Sign Ordinance because the scheme lacks narrow, objective, and definite standard to guide its decision.

151. As evidenced by the Canton's repeated conduct in granting speakers exceptions to its Sign Ordinance in exchange for receiving large sums of money from the speaker and assurances by the speaker to provide Canton economic advantages, it is clear that the Ordinance lacks narrow, objective, and definite standards that the First Amendment requires to guide the Township in its decisions to exempt speakers from the Sign Ordinance's regulations by way of a variance.

152. Rather, Canton possesses unbridled discretion in making the decision to approve or deny a variance from the Sign Ordinance based on arbitrary criteria that is antithetical to the First Amendment.

153. And as evidenced by Canton's repeated conduct in approving the display of signs in the Township that are illegal under its Sign Ordinance, Canton possesses unchecked and unbridled discretion to allow favored speakers to arbitrarily side-step its sign restrictions.

30

154. The overall structure of the Sign Ordinance contributes to its constitutionally infirmed scheme of prior restraint.

155. The several sections of the Sign Ordinance are interdependent and constitute one complete act for the licensing and regulation of signs in the Township.

156. Canton's variance scheme is not independent from other provisions of its Sign Ordinance, but rather inextricably linked to them by providing an open-ended way of relaxing or eliminating the very restrictions the Ordinance seeks to impose.

157. In particular, Canton's variance scheme is not independent from the size, height, and other specific regulations set forth in Section 6A.24 that purport to regulate Outdoor's proposed speech, but is rather inextricably linked to them by providing an open-ended way of relaxing or eliminating the very restrictions that Section 6A.24 seeks to impose.

158. Under the Sign Ordinance, there are no legal locations to erect signs that display ideological, patriotic, social, and many forms of religious speech that Outdoor displays on its billboards and that it intends to display on its proposed billboard in Canton.

159. Under the Sign Ordinance, restrictions imposed on disfavored speech necessarily forces disfavored speakers (if they wish to speak at all) to submit themselves to scheme's arbitrary variance process.

31

160.   Outdoor should not have to submit itself to a speech licensing scheme that lacks narrow, objective, and definite standards to guide the government's decision to license speech.

161.   Outdoor should not have to submit itself to a speech licensing scheme where the licensor considers the economic benefits the government may or may not receive from the speaker before granting a variance from the Sign Ordinance.

162.   Due to the prospect of having to submit itself to the unchecked and unbridled discretion of Canton's officials, Outdoor has not sought the variance necessary to display its proposed sign and, as a result, its intended speech has been altered and deterred by Canton's unlawful variance scheme. **Exhibit 14.**

163.   Due to the prospect of having to submit itself to the unchecked and unbridled discretion of Canton's officials, Outdoor has not sought the variance necessary to display other billboards in the Township and, as a result, its intended speech has been altered and deterred by Canton's unlawful variance scheme. *Id.*

164.   Due to the prospect of having to submit itself to the unchecked and unbridled discretion of Canton's officials, Outdoor is self-censoring its speech. *Id.*

165.   Canton's regulation of signage in the Township is arbitrary, discriminatory toward speakers with modest or moderate economic means, and contains all the hallmarks of a corrupt regulatory framework.

166.  It is believed and therefore alleged that Canton has engaged in a course of conduct designed and intended to violate the constitutional and civil rights of speakers, like Outdoor, that lack the means and desire to render unto Canton large economic or financial benefits, but who wish to nonetheless obtain a variance from the Sign Ordinance, and that punitive damages should be awarded.

167.  Outdoor has suffered and will continue to suffer financial and other harm because of the Sign Ordinance, including the actual and threatened enforcement thereof, its inability to erect and use its proposed billboard in Canton Township, and to erect future billboards in the Township.

WHEREFORE, Plaintiff Outdoor prays for judgment against Canton Township granting Outdoor injunctive and declaratory relief and awarding it damages in an amount to be determined at trial, together with attorney fees and other fees authorized by 42 U.S.C. § 1988, plus costs and interest, along with any other further relief the Court may deem just, proper, and equitable.

Respectfully submitted,

By:/s/Donald R. Sheff II
    Donald R. Sheff II (P78262)
General Counsel
Outdoor One Communications LLC
Attorney for Plaintiff
220 South Main Street
Royal Oak, Michigan 48067
248-289-5895
dsheff@primesitellc.com

Date: February 28, 2023

33